IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| SAMANTHA B.,[1] | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) Civil Action No. 7:20-cv-576 |
| | ) |
| KILOLO KIJAKAZI,[2] | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

**REPORT AND RECOMMENDATION**

Plaintiff Samantha B. ("Samantha") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding her no longer disabled as of February 1, 2017, and therefore ineligible for a period of disability, supplemental security income ("SSI"), and disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. § 1381-1383f; 42 U.S.C. §§ 401–433. Samantha alleges that the Administrative Law Judge ("ALJ") erred by: (1) failing to present all of the RFC limitations to the vocational expert; and 2) failing to address the combined effects of her impairments and conduct a function-by-function analysis.

I conclude that substantial evidence supports the Commissioner's decision in all respects. Accordingly, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. 18) and **DENYING** Samantha's Motion for Summary Judgment (Dkt. 14).

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is hereby substituted for Andrew Saul as the defendant in this case.

## STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence supports the Commissioner's conclusion that Samantha failed to demonstrate that she was disabled under the Act.[3] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Mastro, 270 F.3d at 176 (quoting Craig v. Chater, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

On March 27, 2012, Samantha was awarded DIB and SSI due to Ewing's sarcoma. R. 12, 65–88. On February 9, 2017, the Social Security Administration notified Samantha that her

---

[3] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

2

benefits would end as her health had improved and they determined that she was able to work beginning on February 1, 2017. R. 130, 133. The decision was upheld on reconsideration. R. 138, 141. On June 3, 2019, ALJ Joseph Scruton held a hearing to consider Samantha's request for reconsideration of her disability benefits. R. 32–64. Counsel represented Samantha at the hearing, which included testimony from vocational expert Asheley Wells. Id. On July 31, 2019, the ALJ entered his decision finding that Samantha had medically improved, that her disability ended on February 1, 2017, and that Samantha had not become disabled again since that date. R. 12–24. The ALJ analyzed Samantha's claims under an eight-step evaluation process[4] and denied her claim for social security benefits. Id. The ALJ noted that the most recent favorable medical decision finding Samantha disabled (called the "comparison point decision") was dated September 5, 2012. R. 14.[5]

The ALJ found that Samantha has not engaged in substantial gainful activity. Id. The ALJ found that Samantha suffered from the medically determinable impairments of Ewing's sarcoma. Id. The ALJ determined that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 14–16. The ALJ concluded that Samantha retained the residual functional capacity ("RFC") to perform light work. R. 16–22. The ALJ further determined that Samantha cannot crawl or climb; has no useful ability of the left upper extremity for reaching, handling, and fingering except for minimal use of holding a light item

---

[4] The eight-step process to evaluate Samantha's continuing benefits claim requires the Commissioner to ask, in sequence, whether: (1) the claimant is engaging in substantial gainful activity; (2) the claimant has an impairment that meets or equals the requirements of a listed impairment; (3) the claimant has medically improved; (4) the medical improvement is related to the ability to work; (5) there is an exception to medical improvement that applies; (6) the claimant has current impairments in combination that are severe; (7) the claimant's residual functional capacity based on the current impairments and if she can perform past relevant work; and (8) whether other work exists that the claimant can perform, given her residual functional capacity and considering her age, education, and past work experience. 20 C.F.R. § 404.1594.

[5] Samantha was 27 years old on the date of the ALJ's opinion, making her a younger person under the Act. R. 22.

3

such as keys or a small wallet; will have up to one day a month of unscheduled absences on average; and will be off-task up to ten percent of the day apart from regular scheduled breaks. R. 16. As a result, the ALJ determined that Samantha is unable to perform her past relevant work as a food server, but could perform work that exists in significant numbers in the national economy, such as usher, gate guard, and furniture rental clerk. R. 22. Thus, the ALJ determined that Samantha was no longer disabled as of February 1, 2017 due to her medical improvement. R. 23. Samantha appealed the ALJ's decision, and the Appeals Council denied her request for review on July 20, 2020. R. 1–5.

## ANALYSIS

Samantha alleges that the ALJ failed to properly include all of her RFC limitations in the hypothetical question given to the vocational expert, and failed to address the combined effects of her impairments in a function-by-function analysis.

**A. Medical History Overview**

1. Medical Treatment

At the onset of her period of disability in 2012, Samantha began treatment for Ewing's sarcoma located primarily in her left shoulder blade. R. 499–500. In 2013, Samantha had surgery to remove her left shoulder blade, and her scans showed no evidence of recurrence. R. 500. Samantha has been in remission since her treatment. R. 45.

On February 10, 2015, Samantha reported to Gregory Kuhlman, M.D., that she continued to have pain in her left shoulder that required her to remain on a "high but stable" dosage of narcotics, but also that her pain was gradually improving. R. 500. Dr. Kuhlman determined that Samantha appeared well nourished and had 5/5 strength in her arms and legs except for 3/5 shoulder abduction due to surgery, and normal fine motor coordination of her hands. R. 501. On

April 9, 2015 and June 28, 2015, Michael Douvas, M.D., made the same findings as Dr. Kuhlman regarding Samantha's strength and motor coordination. R. 505, 509. Dr. Douvas noted on those visits that Samantha reported being more socially active, happier, and that she was looking for a part-time job. R. 504, 509. Dr. Douvas also noted that Samantha was able to walk, including walking her dog, and do light work. R. 505, 509, 744, 1344. Throughout 2016, Dr. Douvas made similar findings relating to Samantha's strength, motor coordination, and ability to do light work. R. 518, 522, 1394–1395. From 2015 to 2016, Samantha reported to Kimball Kindley, M.D. and Dr. Douvas that she worked part-time baby-sitting young children. R. 513, 517, 521.

From 2017 to 2018, Samantha reported that she could take care of herself, that she was out of the bed for most of the day, active and taking care of her children, and worked as a waitress at Pizza Hut. See, e.g., R. 794, 1415, 1426, 1435, 1487, 1489. During her disability hearing on March 6, 2018, Samantha testified that her pain and difficulties with her left upper extremity continued, but also that she did not require assistance to shower or dress and that she was able to change her son's diaper "at a longer pace than a normal person," prepare his meals, and bathe and dress him. R. 145.

From 2017 to 2019, Samantha's physicians similarly noted her progress after her surgery and treatment. On February 16, 2017 and June 6, 2017, Dr. Douvas found that Samantha had full strength in her arms except for 3/5 shoulder abduction, normal fine motor coordination of her hands, and that she able is to do light work. R. 795, 1409–1410. During the February 2017 visit, Samantha's CT scans showed no evidence of recurrent disease. R. 803. On July 27, 2017, Samantha reported to Ambereen Mehta, M.D. that her new medication was helping her sleep better and she had a decreased need for oxycodone at night. R. 1420. Dr. Mehta noted that

Samantha was alert, oriented, had normal mood, affect, behavior, and musculoskeletal and neck range of motion. R. 1421. Similarly, in May and June 2018, Dr. Douvas noted tenderness in Samantha's left arm, but also that she had a normal musculoskeletal range of motion and normal muscle tone. R. 1498, 1503, 2316.

On her June 19, 2018 visit with Julio Silvestre, M.D., Samantha reported that her pain did not increase after decreasing her oxycodone usage. R. 2314. Dr. Silvestre also noted that Samantha was negative for fatigue. Id. On July 25, 2018, Samantha reported to Dr. Silvestre that she remained "quite active" and was taking care of her son on a regular basis. R. 2331. On September 21, 2018, James Weston, M.D., noted that Samantha was free of disease and had weaned from her oxycodone medication. R. 2279.

In January 2019, Samantha reported that her pain was stable and somewhat better controlled and that she was active and able to take care of and lift her children. R. 2478, 2487. In March 2019, Dr. Douvas again noted that Samantha had full strength in the left upper extremity with 3/5 shoulder abduction, and that she is able to do light work R. 2445. On her April 16, 2019, visit with W. Nat Timmins, M.D., Samantha reported being satisfied with her pain management and noted being able to partake in her daily activities with her two children. R. 2456.

2. Medical Opinions

On January 11, 2017, state agency medical physician Jameson Buston, M.D., reviewed Samantha's medical evidence and found that Samantha can perform light work with the ability to stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday and to sit (with normal breaks) for a total of six hours in an eight-hour workday. R. 95. Dr. Buston listed postural and reaching limitations relating to her non-dominant left arm, but found that Samantha had unlimited ability for handling, fingering, and feeling. R. 95–96.

On March 10, 2017, Dr. Douvas wrote a letter to support Samantha's disability claim and stated that her ability to work was "significantly limited" and that her application for disability was "reasonable." R. 809. However, Dr. Douvas had previously reported since 2014 that Samantha was capable of light work, including one month prior to the March 2017 letter. R. 505, 509, 518, 522, 526, 743, 748, 753, 758, 766, 774, 795. Dr. Douvas stated that prolonged sitting and standing would make Samantha's pain worse, but Samantha reported that she did not have any difficulty in these areas. R. 809. However, on June 6, 2019, Dr. Douvas noted that Samantha could stand/walk for about four hours and sit for at least six hours in an eight-hour workday. R. 2433. Dr. Douvas also stated that Samantha could frequently handle and finger and occasionally reach, but not overhead. Id. Dr. Douvas did not provide any information regarding the reasons he believed that Samantha's left shoulder limitations would limit her ability to walk or stand throughout the course of an eight-hour workday. R. 2433–2434. Therefore, the ALJ found Dr. Douvas's March 2017 opinion unpersuasive. R. 21.

On June 22, 2017, medical consultant Daniel Camden, M.D., conducted a physical RFC analysis of Samantha. R. 826–833. Dr. Camden found that Samantha was capable of light work, including the ability to stand and/or walk and sit for about six hours in an eight-hour workday, with normal breaks. R. 827. Dr. Camden noted that, due to her left shoulder surgery, Samantha would not be able to climb ropes or ladders, and she would have additional postural limitations. R. 828. Similarly to Dr. Buston, Dr. Camden found that Samantha would be limited in her reaching with her left arm, but otherwise would have no manipulative limitations in either arm with respect to handling, fingering or feeling. R. 829. Dr. Camden disagreed with Dr. Douvas's March 2017 opinion and noted that Dr. Douvas's opinion was not consistent with the medical

evidence in the record, including Dr. Douvas's own medical treatment notes which found Samantha capable of performing light work. R. 832.

### B. Physical RFC and Function by Function Analysis

Samantha argues that her RFC contains a limitation that was not presented to the vocational expert ("VE") in any of the ALJ's posed hypotheticals. Pl.'s Br. at 3–4, Dkt. 15. Samantha notes that for a VE's opinion to be helpful to determine jobs that Samantha could perform, the expert's opinion must be in response to proper hypothetical questions which fairly set out all of the claimant's impairments. Id. at 4. Samantha contends that a discrepancy in the terms "occasional" in the hypothetical and "minimal" in the RFC led to a more restrictive RFC contemplating a "minimal use of holding an item" instead of the "occasional handling, fingering, and feeling" limitation posed to the VE.

Samantha's arguments regarding the RFC's exertional limitations related to her left upper extremity for reaching, handling, and fingering are without merit. Samantha asserts that the RFC "eliminates [her] ability to reach with her left upper extremity, whereas the hypothetical presented to the vocational expert involved an individual who could perform 'no other manipulative movement with the non-dominant left upper extremity' beyond occasional handling, fingering and feeling." Pl.'s Br. at n. 2, Dkt. 15; R. 16, 59. Samantha further contends that without an explicit limitation it is possible that the VE interpreted this language as reiterating the prior limitation of only using the left upper extremity "occasionally for handling, fingering, or feeling." Essentially Samantha argues that is "unclear whether the vocational expert considered a prohibition on reaching with the left upper extremity in identifying the jobs upon which the ALJ ultimately relied." Id.

8

The ALJ properly relied on the VE's testimony. At the administrative hearing, the ALJ first directed the VE to determine whether a hypothetical individual with Samantha's exertional limitations and vocational profile was capable of performing her past relevant work or other work that existed in significant numbers in the national economy if that individual was limited to light exertional work with no crawling or climbing, and only occasional use of her left (non-dominant) arm for handling, fingering or feeling and no other manipulative movement with the left (non-dominant) arm. R. 58–60. The VE responded that the hypothetical individual could perform work in the national economy, such as usher, gate guard and furniture rental clerk. R. 59–60.

A vocational expert must base his opinion upon a consideration of all the evidence in the record, and submit the opinion in response to proper hypothetical questions which fairly set out all of a claimant's impairments. See, e.g., Day v. Colvin, 2:12–CV–00014–FDW, 2013 WL 4039422, at *5 (W.D.N.C. Aug. 7, 2013) (citing Walker v. Bowen, 889 F.2d 47, 51 (4th Cir. 1989)). In this case, the ALJ covered all of Samantha's medically established impairments in his hypothetical questions to the vocational expert. The hypothetical question to the VE fairly describes the limitations included in the RFC and is supported with substantial evidence.

Contrary to Samantha's argument that is unclear whether the VE considered a prohibition on reaching with the left upper extremity, Samantha's counsel specifically asked the VE to confirm that "the jobs [she] identified can be performed by a one-handed or one-armed individual," which directed the VE to confirm that the jobs considered were permissible for a one-armed individual. R. 61–62. In fact, Samantha's counsel further asked the vocational expert to confirm whether Samantha could perform the jobs of usher, gate guard or furniture rental clerk if she was unable to use her left arm other than to hold something light like keys or a small

9

wallet. Id. As a result of the follow-up hypotheticals addressing Samantha's left upper extremity physical limitations, the VE reiterated that the identified jobs of usher, gate guard and furniture rental clerk, were consistent with the Dictionary of Occupational Titles and could accommodate a limitation to holding something light like keys or a small wallet. R. 22, 59–63. Thus, the VE considered Samantha's exertional limitations and the ALJ properly relied on the expert's testimony.

Thus, the VE considered light exertional jobs which could be performed with an individual who is working with one hand, with no useful ability to use the non-dominant hand, and excluding reaching with the left upper extremity. R. 61. Further, Drs. Douvas, Buston, and Camden all found that Samantha would be able to work at the light exertional level specified in the RFC, including the inability to reach with the left upper extremity. See R. 95–96, 505, 509, 518, 522, 526, 743, 748, 753, 758, 766, 774, 795, 826–833.

Accordingly, I find that the ALJ adequately addressed Samantha's impairments and accurately relied upon the VE's testimony to support his finding that Samantha is no longer disabled and can perform light work with certain limitations.

Samantha also asserts that the ALJ erred by failing to address the combined effects of her impairments, including pain and fatigue, and did not perform a proper function-by-function analysis. Pl.'s Br. at 5–9, Dkt. 15. However, I find that the ALJ properly addressed the combined effects of Samantha's impairments and provided a RFC that is supported by substantial evidence.

A function-by-function analysis requires the ALJ to develop an adequate RFC which accounts for the work activities the claimant can perform given the physical or mental impairments affecting his ability to work. Importantly, the ALJ must explain the conclusions reached and explain any record evidence which contradicts the RFC determination. See SSR 96-

10

8p; see also Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that an ALJ needs to provide an explicit explanation linking medical evidence listed in the decision to his ultimate findings). The ALJ is instructed to cite specific medical facts and non-medical evidence supporting his conclusion, discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, describe the maximum amount of each work-related activity the individual can perform, and explain how any material inconsistencies or ambiguities in the evidence were considered and resolved. SSR 96-8p, 1996 WL 374184, at *7.

In Mascio v. Colvin, the court rejected a "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis," agreeing instead with the Second Circuit that "'[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" Mascio, 780 F.3d at 636 (citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)). "The Mascio Court held remand was necessary, in part, because the ALJ failed to indicate the weight given to two residual functional capacity assessments which contained relevant conflicting evidence regarding the claimant's weight lifting abilities." Newcomb v. Colvin, No. 2:14–CV–76, 2015 WL 1954541, at *3 (N.D.W. Va. Apr. 29, 2015).

Here, the ALJ's decision includes the narrative discussion required by SSR 96-8p and contains sufficient information to allow meaningful review. Unlike the ALJ in Mascio, the ALJ in this case did not fail to consider conflicting medical evidence. Further, the court is "not left to guess about how the ALJ arrived at his conclusions" because the ALJ's findings include a comprehensive analysis of Samantha's medical records, the medical opinions, Samantha's

11

hearing testimony, and the ALJ's conclusions. R. 17–24. The ALJ's opinion specifies how the limitations in the RFC correlate with Samantha's severe impairment in her left upper extremity.

"It is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render [a] claimant unable to engage in substantial gainful activity." Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). Where a claimant has multiple impairments, the ALJ must consider the combined effect of those impairments in determining whether the claimant is disabled. Id.; 20 C.F.R. § 404.1523. However, "an ALJ need not explicitly state that he or she has considered a claimant's impairments in combination. What matters is whether it is discernible from the ALJ's decision that he or she did so." Jones v. Astrue, 2011 U.S. Dist. LEXIS 52322, at *42, 2011 WL 1877677, at *12 (W.D. Va. May 17, 2011).

Samantha contends that the ALJ did not properly consider her pain and fatigue in considering her combination of impairments. However, the ALJ did not ignore this evidence. The ALJ's opinion specifies how the limitations in the RFC correlate with Samantha's impairments and addresses her alleged symptoms including fatigue, which the ALJ noted were inconsistent with the medical evidence in the record. R. 17–19, 21–22, 61.

The record documents that Samantha's pain was not debilitating, therefore the ALJ found that her alleged symptoms would not prevent her from light work with exertional limitations. Samantha reported that she was able to change diapers at a slow pace, prepare meals, and drive a car to take herself and her children to their appointments. R. 145, 2473, 2478. Further, Samantha also reported that she was able to walk her dog for exercise and that she had no difficulty standing, walking or sitting. R. 300, 500, 774, 1344. Regarding Samantha's alleged pain

symptoms, she reported in January 2019 that her pain was stable and somewhat better controlled. R. 2478, 2487. Finally, regarding her alleged fatigue, Samantha's medical records consistently showed that she was alert and oriented. See e.g., R. 1416, 1445, 1483, 1498, 2317, 2378, 2441, 2481. In fact, after her treatment in 2013, Samantha reported that she was active and denied fatigue or was found negative for fatigue by her treating physicians. See e.g., R. 513, 517, 1370, 1376, 1381, 1413, 1473, 1487, 1495, 2314, 2331, 2344, 2375. Samantha also reported that she was able to work as a part-time babysitter to young children after her shoulder surgery and treatment from 2015 to 2016. R. 513, 517, 521. Thus, the ALJ found that Samantha's self-reported progress and ability to do the daily activities described above demonstrated that she is no longer disabled due to her Ewing's sarcoma.

Moreover, as described above, Samantha's medical providers found that she was capable of light work with exertional limitations relating to her left upper extremity. While Dr. Douvas determined that Samantha's ability to work was "significantly limited" and that her application for disability was "reasonable," the ALJ and Dr. Camden discounted the opinion as inconsistent with Dr. Douvas's own findings and the record. Specifically, Dr. Douvas reported since 2014 that Samantha was able to do light work, including after his 2017 opinion. See, 2396, 2445. From 2015 to 2019, Drs. Douvas and Kuhlman found that Samantha had full strength in the left upper extremity except for 3/5 shoulder abduction. R. 501, 505, 509, 795, 1409, 2445.

The ALJ properly considered the combined effect of Samantha's impairments in finding that she was no longer disabled since February 1, 2017. While Samantha may disagree with the ALJ's interpretation of the evidence, it is not for this Court to "re-weigh conflicting evidence" or "substitute [its] judgment" for that of the ALJ. Craig, 76 F.3d at 589 (4th Cir. 1996).

Accordingly, I find that substantial evidence supports the ALJ's RFC finding that Samantha is no longer disabled and no longer entitled to a period of disability, SSI, and DIB.

## CONCLUSION

For the foregoing reasons, I **RECOMMEND** entering an order **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** the plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The Clerk is directed to transmit the record in this case to Michael F. Urbanski, Chief United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objections, including the waiver of the right to appeal.

Entered:  February 22, 2022

*Robert S. Ballou*
Robert S. Ballou
United States Magistrate Judge